2021 IL App (2d) 190624-U
No. 2-19-0624
Order filed September 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF JAMES CEHODA | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 16-MR-1113 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. James Cehoda | ) | Brendan A. Maher, |
| Respondent-Appellant). | ) | Judge, Presiding. |

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

¶ 1    *Held*: The trial court's determination that respondent was a sexually violent person is affirmed where the State proved that respondent's mental disorder was a congenital or acquired condition and respondent failed to show ineffective assistance of counsel or juror misconduct.

¶ 2    Respondent, James P. Cehoda, was adjudicated to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq*. (West 2016)). Respondent appeals, arguing that the State failed to prove the allegations of its petition beyond a reasonable doubt, that respondent's trial counsel was ineffective, and that the jury engaged in juror misconduct in rendering its verdict. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      In 1992, respondent was convicted of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, ¶¶ 12-13(a)(1), 12-14(a)(2)) and one count of kidnapping (Ill. Rev. Stat. 1991, ch. 38, § 10-1(a)(1)) and was sentenced to 50 years' incarceration. On December 7, 2016, respondent was scheduled to be released. However, on November 28, 2016, the State filed its petition to commit respondent as a sexually violent person under the Act. The trial court appointed an assistant public defender to represent respondent and scheduled a probable cause hearing for November 30, 2016. On that date, respondent's counsel appeared and filed its motion for substitution of a judge, effectively postponing the probable cause hearing. On December 14, 2016, the matter was reassigned to a different judge. Sometime after this date, respondent's counsel left the Public Defender's Office, and a new assistant public defender was assigned the case.

¶ 5      On February 6, 2017, the parties appeared for a probable cause hearing, but respondent's new counsel indicated that he "had the opportunity to speak with [his] client," and that it was "his wish to waive [the] probable cause hearing." As such, the parties stipulated on "a finding of probable cause."

¶ 6      On June 21, 2017, while in custody, respondent filed a *pro se* demand for discharge from state custody, based on alleged constitutional violations and established decisions of various courts. The trial court did not address the motion at that time.

¶ 7      Respondent's counsel retained an independent evaluator, Dr. Robert Meyer, who was appointed to conduct an examination of respondent on October 17, 2017. The report does not appear in the record. "[A] few weeks" before May 11, 2018, respondent's counsel left the Public Defender's Office. By June 7, 2018, the case was reassigned to another assistant public defender,

who would represent respondent throughout the remaining trial court proceedings.

¶ 8     On December 14, 2018, the parties appeared for a status call and discussed several issues concerning respondent's upcoming jury trial. Respondent's counsel indicated that she did not anticipate that respondent would call any witnesses during the trial. While she suggested that she had obtained a report from her own expert—presumably Dr. Meyer—she also indicated that respondent would not be entering his own report into evidence.

¶ 9     On January 23, 2019, the parties held a pretrial conference. Respondent's counsel presented a motion *in limine* seeking to exclude witnesses from the courtroom prior to presenting any testimony, a motion for individual *voir dire*, and an oral motion seeking permission for respondent to dress in street clothes and to remain unshackled during the course of the trial. Noting that its typical procedure for questioning prospective jurors was already "in effect individual *voir dire*," the trial court denied respondent's counsel's motion for individual *voir dire* but granted her remaining motions.

¶ 10    On April 17, 2019, the parties held their final pretrial conference. Respondent's counsel tendered a copy of her proposed jury instructions to the court. The parties went over the State's motions *in limine*, prompting numerous objections from respondent's counsel. For example, respondent's counsel objected to the State's requests that the trial court preclude respondent from arguing or implying that respondent's criminal convictions were invalid, from suggesting that respondent "has served his time for [his] offenses," from suggesting that "respondent would be on parole or supervised release[ ]if not found to be a [s]exually [v]iolent [p]erson," or from implying "any information about commitment options such as secure care or conditional release." Additionally, respondent's counsel objected to the State's requests to preclude respondent from

mentioning whether "any actuarial instruments used in this case *** [were] experimental or *** not generally accepted," or from opining on the "effectiveness or ineffectiveness of any sex offender treatment program" or relapse prevention plans.[1] After disposing of the motions *in limine*, the parties discussed and finalized their *voir dire* questions that would be used in selecting a jury.

¶ 11     At the final pretrial conference, respondent asked the court about his earlier demand for discharge, which he filed in June 2017, pointing out that the trial court "never did answer" the motion. Respondent's counsel—who was not assigned to the case at the time of the filing— informed the judge that she would "take a look at that [motion]." The trial court informed respondent that "generally speaking, a *** defendant who is represented by an attorney does not have any authority to file *pro se* motions and have them adjudicated by the [c]ourt." Nonetheless, the court advised respondent that it would address the motion on the morning of his upcoming trial.

¶ 12     On April 22, 2019, the parties appeared for jury selection. Prior to *voir dire*, the court asked respondent, "[Y]ou have received and had an opportunity to look at the independent evaluation that you sought through your attorney from, I believe, it was Dr. Meyer?" While respondent couldn't remember the name of his evaluator, he confirmed that "there was an evaluation." The trial court then asked, "[T]he defense did, in fact, secure a written evaluation from Dr. Meyer; is that correct?" Respondent responded, "Right." The court then asked, "[Respondent], you and your attorney have had a chance to review the independent evaluation that was secured on behalf of the

---

[1] Because respondent does not challenge the trial court's rulings on the State's motions *in limine*, we need not address them further.

defense in the case together at some point in time[?]" Respondent responded, "Yeah." The court then specifically asked respondent, "But the individual retained on your behalf, on behalf of the defense, you've decided not to call that person to testify at the trial?" Respondent once again agreed with the court.

¶ 13     After this exchange, respondent's counsel informed the court that she would not be adopting respondent's motion to be discharged from state custody. The trial court asked respondent whether he would like to nonetheless pursue arguing his motion either through new counsel or by himself, resulting in his current counsel's discharge. Respondent answered, "I can't afford a regular lawyer and a public defender; one is just as good as the other. So leave it as is." The trial court asked whether respondent would therefore like to proceed with trial, prompting respondent to answer, "[L]et's go to trial and get this over with." Respondent confirmed that after speaking with his counsel, he wished to exercise his right to a jury trial in lieu of a bench trial.

¶ 14     On April 23, 2019, the jury trial commenced. Dr. Kristopher Clounch testified that he was a licensed clinical psychologist who conducted an October 2016 evaluation of respondent, from which he wrote a report detailing his findings and later, an addendum to that report. As part of the initial evaluation, Dr. Clounch performed a risk analysis and considered respondent's mental condition, criminal history, disciplinary history, and "his behavior in general." Dr. Clounch testified that in May 1983, respondent was "initially arrested for indecent liberties with a child; ultimately, he was in turn charged with contributing to the sexual delinquency of a child." Records indicated that prior to respondent's arrest, he had "kissed and was undoing or unbuttoning the pants of a minor female." When speaking with Dr. Clounch, respondent had denied "any sexual contact," but he did indicate that "he had been accused of touching his brother's girlfriend's niece,"

who was "13 or 14 [years old] at the time."

¶ 15    Dr. Clounch further described how in May 1985, respondent was arrested and charged with criminal sexual assault and criminal sexual abuse. "This was for the sexual assault of *** a 17[-]year[-]old[ ]female stranger." Police reports indicated that officers arrived at respondent's apartment in response to a disturbance, where they encountered the victim's boyfriend, who informed police that respondent had raped his girlfriend. The victim similarly reported that she had "gone to the apartment complex to visit her boyfriend and friend who happened to be living across from [respondent's] apartment." After finding that her boyfriend and friend were not home, respondent allowed her to enter his apartment, where she could wait and use his phone. There, respondent "began coming on to her," offering her marijuana and a drink. He had the victim try on women's clothes—including a bikini—that he had at the apartment.   While attempting to leave respondent's bedroom, respondent pushed her onto his bed and climbed on top of her. He then removed her top and "sucked and licked on her breasts." He told her that, if she had his baby, "the baby would do the same thing to her." He removed the bikini bottoms from the victim, spread her legs, and performed oral sex on her. Stopping for a moment, respondent told the victim that "all the girls love [him] because of [his] long tongue." He then penetrated the victim vaginally and ejaculated on the victim's abdomen and pubic area. Afterwards, respondent told victim that she needed to go, but that "they should do this again sometime and that she would remember this in her dreams for a long, long time." Court records indicated that the criminal sexual assault charge "was amended to unlawful restraint," and that respondent was ultimately convicted of that charge before being sentenced to three years' incarceration.

¶ 16    Dr. Clounch then recounted respondent's August 1987 convictions for one count of

aggravated battery, one count of battery, one count of illegal possession of a weapon by a felon, and one count of unlawful restraint, which resulted in a sentence of eight years' incarceration. Prior to his arrest, respondent was reported to have "jumped out from behind a bush" so that he could grab the victim, an 18-year-old female, and threaten her with a knife. Respondent indicated that he would kill the victim if she did not go with him, but she was able to free herself and escape.

¶ 17    Dr. Clounch went on to testify about respondent's May 1991 arrest for aggravated criminal sexual assault, unlawful restraint, and kidnapping. Police reports indicated that prior to being arrested, respondent abducted a 19-year-old female from a parking lot as she approached him to sell him magazines. After grabbing the victim by the hair and pulling her into his vehicle, respondent "began beating her head against the inside of the car door," before producing a pistol. After being threatened by respondent, the victim was pulled into his vehicle. Respondent forced the victim to the vehicle's floorboard and made her remove her clothing. He "fondled her vagina and roughly fondled her breasts[,] leaving bruises." Respondent also poked and hit the victim, before forcing her to "perform oral sex on him on four separate occasions" while respondent drove. After arriving at his apartment complex, respondent "had the victim get dressed," "grabbed her by the throat[,] and covered her eyes as he walked her to his apartment." There, he again had the victim remove her clothing, bound her hands behind her back "so tightly that it cut off circulation to her hands," before eventually "forcibly" raping her.

¶ 18    After assaulting the victim, respondent forced her to take a shower with him. After taking the shower, the victim convinced respondent to leave the apartment to retrieve cigarettes for her. Once he left, she escaped and contacted the police. Ultimately, he was convicted of two counts of aggravated criminal sexual assault and one count of kidnapping. For these crimes, respondent was

sentenced to 50 years' incarceration.

¶ 19    Dr. Clounch also reviewed respondent's nonsexual criminal history in his evaluation. He described how respondent had "a 16 year history of offenses in which he had been arrested for," including drug possession, criminal damage to property, "several batteries," arson, burglary, and unlawful restraint. When asked whether respondent was "successful when he was on probation or parole in the community," Dr. Clounch answered, "According to records, he has not been successful while on probation or parole." Dr. Clounch further indicated that at the time of several of respondent's sex-offense arrests, "he had recently been released from incarceration[,] *** [s]o he would have been under some type of supervision at [those] time[s] as well." Respondent was released from prison approximately two weeks before being arrested for the May 1991 aggravated criminal sexual assault and kidnapping. When asked whether respondent "completed or participated in any sex offender treatment" while in prison or the community, Dr. Clounch responded, "No."

¶ 20    Based on respondent's criminal history, behaviors, prison records, and interviews, Dr. Clounch determined "to a degree of psychological certainty" that the respondent suffered from "other specified paraphilic disorder," specifically in that he was "sexually aroused by nonconsenting partners." The State asked Dr. Clounch whether the paraphilic disorder was "a congenital or an acquired condition." Dr. Clounch answered, "Yes, it is," before explaining that congenital conditions accompany individuals at birth, while acquired conditions are acquired at some point during an individual's life. Dr. Clounch further explained that respondent's paraphilic disorder affected his "volitional capacity," meaning it impacted his "ability to ultimately control his behavior," as suggested by the fact that he had "engaged in inappropriate sexual contact with

at least two victims." Consequently, Dr. Clounch found respondent to be predisposed to engage in continued acts of sexual violence.

¶ 21    Dr. Clounch then described how he used an "actuarial approach" as part of carrying out respondent's risk assessment through two different instruments: the Static-99R and the Static-2002R. Because the actuarial instruments relied upon recidivism data which, in turn, was based on historically underreported sexual offenses, the instruments typically "underestimate risk." Under the Static-99R, respondent scored a five, meaning he was at an above average risk of reoffending. According to Dr. Clounch, "[i]ndividuals with the same score as [respondent] have been found to reoffend at a rate 2.7 times the rate of the typical sex offender[,] represented by a score of [two]." Dr. Clounch described how "85 of 100 sex offenders scored *** below [respondent's] score." Under the Static-2002R, respondent again scored a five, indicating that "71 of 100 sex offenders scored on the measure would score below him." Again, Dr. Clounch opined that respondent's test results indicated an "above average" risk of reoffending, "at a rate of 1.9 times the rate of the typical sex offender."

¶ 22    Dr. Clounch additionally utilized the Stable-2007 measure to analyze "both dynamic risk factors and protective factors" as part of respondent's risk assessment. He described dynamic risk factors as "psychologically meaningful factors that have been found to be related to sexual reoffense" which "can ultimately be addressed in treatment" and protective factors as "factors that result in a reduction of the individual's risk." Respondent scored a "16 out of a possible 24 points on the measure," placing him "in the high risk category." Specifically, respondent was placed "at the 93.9 percentile *** indicating that 93 of 100 sex offenders[] *** would score below [respondent's] score." In combining this measure with the Static-99R and the Static-2002R,

respondent "was placed in the Level IVb, well above average *** risk category." Others in this risk category "have been found to reoffend at a rate of [three] to [four] times the rate of the average individual convicted of sexual offenses."

¶ 23     When asked whether he had "an opinion to a reasonable degree of psychological certainty *** as to *** respondent's risk of sexually reoffending, Dr Clounch ultimately responded, "[Respondent] is substantially probable to reoffend sexually if not confined." Dr. Clounch then testified as to his beliefs that "respondent had a conviction for a sexually violent offense," that "respondent [is] dangerous because he suffers from a mental disorder that is congenital or acquired," and that respondent's disorder affected "his emotional or volitional capacity and predispose[d] him to commit continued acts of sexual violence." Dr. Clounch finally concluded that respondent met the criteria to be found a sexually violent person.

¶ 24     On cross-examination, respondent's counsel asked Dr. Clounch whether respondent was convicted of indecent liberties with a child as a result of his May 1983 arrest. Dr. Clounch indicated that respondent was found not guilty in that case. Dr. Clounch further agreed that respondent was not convicted of criminal sexual assault stemming from his May 1985 arrest nor his August 1987 arrest. Dr. Clounch admitted that respondent denied any wrongdoing with regards to any of his prior described arrests. Dr. Clounch also agreed that respondent "had very little disciplinary history while in the Department of Corrections." Respondent did not exhibit any type of sexual violence during his incarceration. Respondent's counsel inquired about the reports that Dr. Clounch relied on in compiling his assessment. Dr. Clounch acknowledged that he did not compile the reports that his assessment relied on. Instead, he testified that there could "be two or three people removed from the time [he] would review [other individuals' reports]."

¶ 25    The State then called Dr. David Suire to testify. Dr. Suire testified that he was a licensed clinical psychologist and sexually violent person evaluator who also evaluated respondent. Dr. Suire described respondent's criminal history as being "pervasive" and discussed respondent's 1983, 1985, 1987, and 1991 offenses. Partly based on these offenses, Dr. Suire diagnosed respondent with paraphilic disorder with regards to "nonconsenting persons." Additionally, Dr. Suire diagnosed respondent with "alcohol use disorder moderate[,] cannabis use  disorder mild[,] and other specific personality disorder, with antisocial features." In reaching this final diagnosis, Dr. Suire noted "the fact that *** over a 16 year period[, respondent] had 24 separate charges[ and] 14 convictions. He had convictions for sexually [*sic*] offenses, [and] nonsexual offenses. He has had violent offenses. He's had theft-related offenses. He's had [offenses] related to substance abuse." Dr. Suire further remarked that respondent "has spent most of his adult life either incarcerated or under some sort of supervision due to his criminal behavior." Despite this fact, respondent "has still managed to pile up a *** pretty impressive stack of criminal behaviors," which was consistent with an antisocial personality disorder.

¶ 26    The State asked, "Now, these four mental diagnoses that you diagnosed the respondent with, are they congenital or acquired conditions?" Dr. Suire replied, "They are." Dr. Suire postulated that respondent's disorders affected respondent's emotional or volitional capacity and "predispose[d] him to commit future acts of sexual violence." Pursuant to Dr. Suire's risk assessment, respondent scored a "five or a six" under the Static-99R and a five under the Static-2002R. Dr. Suire also considered dynamic and protective factors in finding that, to a reasonable degree "of psychological certainty," respondent's risk of reoffending was "substantially probable," meaning respondent was "much more likely than not" to reoffend. Like Dr. Clounch, Dr. Suire

agreed that respondent had a conviction for a sexually violent offense, that respondent was dangerous "because he suffers from a mental disorder that's congenital or acquired and predisposes him to commit further acts of sexual violence, and that respondent's disorders "affect [his] emotional and volitional capacity," predisposing "him to commit future acts of sexual violence." For these reasons, Dr. Suire opined that respondent met the criteria to be found a sexually violent person.

¶ 27    On cross-examination, respondent's counsel asked questions establishing that Dr. Suire based his opinions "somewhat" on "records that were written by others." Again, counsel further elicited testimony establishing that respondent was not convicted from his May 1983 offense, nor of any sexual offenses stemming from his 1985 and 1987 offenses. Dr. Suire also admitted that he was unaware of any alcohol or cannabis use that respondent engaged in "since 1991 at least."

¶ 28    Following Dr. Suire's testimony, the State and respondent's counsel negotiated over jury instructions and respondent indicated that he did not wish to testify. Afterwards, the parties delivered their closing arguments. During respondent's closing arguments, counsel pointed out that the records that Dr. Clounch and Dr. Suire relied on were "written years ago *** by *** two or three people at least removed from them." Counsel added that some of the records were "30 year[s] old or more." Counsel further explained that the State's experts had also based their opinions on "short periods of time actually [spent] with [respondent]" and "unsubstantiated allegations from years ago." Again, counsel noted that several of the allegations regarding respondent's conduct did not result in convictions. Counsel also noted the differences between Dr. Clounch's and Dr. Suire's testimonies—specifically the fact that Dr. Suire found respondent to have several substance-abuse disorders, despite the fact that "[n]o actual evidence" was able "to

prove that."

¶ 29    After deliberating for 26 minutes, the jury found respondent to be a sexually violent person. Respondent's counsel requested that the jury be polled, and each juror confirmed the verdict. On May 17, 2019, respondent—through his counsel—filed a motion for new trial, arguing that the jury's verdict was contrary to the law and to the evidence adduced at trial. Respondent argued that, instead, "the verdict [was] the result of the passion, bias[,] and prejudice of the jury against *** [r]espondent." The trial court denied the motion and the matter proceeded to dispositional hearing. At that hearing, the State introduced a report from Dr. Suire in support of the State's position that "respondent be remanded to *** secure institutional treatment at the treatment detention facility." Respondent's counsel argued that respondent should be placed on conditional release coupled with treatment outside of a secure facility. After reading the pre-dispositional investigation report and considering the evidence adduced at trial, the court ordered respondent to be committed to institutional care at a secure facility. Respondent timely appealed.

¶ 30                                        II. ANALYSIS

¶ 31    On appeal, respondent argues that the State failed to prove the allegations of its petition beyond a reasonable doubt, that respondent's trial counsel was ineffective, and that the jury engaged in juror misconduct in rendering its verdict. We address each of these arguments in turn.

¶ 32                              A. Sufficiency of the Evidence

¶ 33    First, the State carried its burden in proving that respondent is a sexually violent person beyond a reasonable doubt. "When reviewing claims challenging the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of*

*Fields*, 2014 IL 115542, ¶ 20. We refrain from retrying respondent while reviewing his claims. *In re Tittlebach*, 324 Ill. App. 3d 6, 11 (2001). Instead, "[o]n review, we ask only whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could find that the elements *** [were] proved beyond a reasonable doubt." *Id.*

¶ 34    The Act defines a "sexually violent person" as "a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2016). Furthermore, " 'Mental disorder' means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016).

¶ 35    Here, respondent argues that the State failed to carry its burden because neither of its testifying experts provided whether respondent's purported paraphilic disorder was specifically congenital or acquired. Otherwise put, while respondent acknowledges that both experts opined that his paraphilic disorder was *either* congenital or acquired, he argues that the State was required to prove with specificity exactly how "said condition allegedly developed in [respondent]."

¶ 36    Respondent's argument runs contrary to Illinois case law. In *In re Commitment of Moody*, 2020 IL App (1st) 190565, which was decided after respondent and the State filed their briefs, the First District was confronted with the very same argument that respondent now brings before us:

> "The respondent alternatively argues that the evidence was insufficient to prove
> that he suffers from a mental disorder because, contrary to the plain language of the statute,
> the State failed to specify whether he suffered from a condition that was either 'congenital

or acquired' and then prove to which of these two categories his mental disorder belongs."

*Id.* ¶ 54.

There, the court disagreed that the plain language of the statute required the State to show exactly which of the two types of conditions accurately described the respondent's disorder:

"Contrary to the respondent's contention, the Act does not require the State to prove with specificity whether the respondent's mental disorder is 'congenital or acquired.'

***

[T]he most natural reading of the statute is that a mental disorder is any condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence, whether congenital or not. Contrary to the respondent's position, this reading does not render the phrase 'congenital or acquired' meaningless. Rather, it acknowledges the intent of the legislature to focus commitment proceedings on persons who have a mental condition that predisposes them towards sexual violence, regardless of the underlying source of that condition." *Id.* ¶¶ 56-57.

We agree with the *Moody* court's determination that the plain reading of the statute does not require the State to show specifically whether a mental disorder was acquired at birth or whether it was later acquired—such a distinction is meaningless as under either circumstance, respondent's condition would still satisfy the Act's definition of a mental disorder. Respondent cites no case law advancing his alternative reading of the statute. As such, we disagree with respondent's contentions and find that the State proved that respondent had a mental disorder beyond a reasonable doubt.

¶ 37                              B. Ineffective Assistance of Counsel

¶ 38    Second, respondent has failed to adequately show that he received ineffective assistance of

counsel before the trial court. Persons committed under the Act are entitled to effective assistance of counsel, measured by the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re Commitment of Bushong*, 351 Ill. App. 3d 807, 817 (2004). Pursuant to that standard, a party seeking to establish ineffective assistance of counsel must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 693.

¶ 39    However, under *U.S. v. Cronic*, 466 U.S. 648, 659 (1984), "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights [to effective counsel] that makes the adversary process itself presumptively unreliable." Under these circumstances, prejudice may be presumed. *Id.* However, in order for *Cronic's* "narrow" exception to *Strickland's* requirements to apply, a party must show that their counsel's failure was "complete," "meaning that 'counsel failed to oppose the prosecution throughout the *** proceeding as a whole.' " *People v. Cherry*, 2016 IL 118728, ¶ 26 (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002)). In other words, this rarely utilized exception is not triggered unless "counsel abandons even the pretense of defending his client," such that "counsel's effectiveness has fallen to such a low level as to amount not merely to incompetence, but to 'no representation at all.' " *People v. Caballero*, 126 Ill. 2d 248, 267 (1989) (citing *Cronic*, 466 U.S. at 659).

¶ 40    Here, respondent brings forth a laundry list of purported deficiencies in his trial counsel's performance, arguing that counsel's performance "did not qualify as a meaningful adversarial testing of the State's case." Specifically, the entirety of respondent's deficient-performance argument notes the following conduct and perceived omissions:

"[Respondent's] trial counsel did not prepare or serve any written interrogatories or requests to produce nor conduct any depositions of either Dr. Clounch or Dr. Suire. Trial counsel only prepared one pretrial [m]otion [*in limine*,] and that only sought the exclusion of witnesses during trial. Trial [c]ounsel did not file any [m]otions [*i*]*n* [*l*]*imine* seeking to exclude or challenging the methods or opinions to be offered by Drs. Clounch or Suire. Trial counsel's [o]pening [s]tatement on behalf of [respondent] was only 19 lines of transcript in length. Trial counsel conducted only limited cross-examination of Dr. Clounch and of Dr. Suire. Trial [c]ounsel presented no witnesses to testify on behalf of [respondent]. Trial [c]ounsel stipulated to the admission of a certified copy of [respondent's] 1991 [c]riminal [c]onviction. Trial counsel did not object to the admission into evidence of the two written reports of Dr. Clounch's evaluations of [respondent]. Trial [c]ounsel did not object to the admission of Dr. Suire's [f]irst and [s]econd written reports of his evaluations of [respondent]. Trial counsel did not challenge either Dr. Clounch or Dr. Suire on the basis of a prior inconsistent statement. Trial [c]ounsel's final argument on behalf of [respondent] is extremely brief and is contained on 38 lines on less than two full transcript pages. Trial [c]ounsel did not request any [s]pecial [v]erdict forms to be given to the jury." (Internal citations omitted.)

¶ 41 Respondent's arguments are seriously undermined by his failure to explain how any of these purported shortcomings constituted deficient performance. For example, while respondent criticizes his trial counsel for only filing one motion *in limine*, he fails to suggest what additional

motions *in limine* should have been filed.[2] While respondent points out that counsel only engaged in a "limited cross-examination" of Dr. Clounch and Dr. Suire, he does not provide why a more detailed cross-examination was necessary, or how counsel's cross-examination could otherwise have been improved. Respondent also argues that counsel should have objected to Dr. Clounch's reports but does not provide any basis for doing so. Respondent similarly chides counsel for failing to challenge Dr. Clounch's and Dr. Suire's "prior inconsistent statement[s]," but never mentions what inconsistent statements he is referring to. As such, respondent has not demonstrated that counsel's performance was deficient, particularly where respondent has not identified any specific instances of conduct.

¶ 42    Regardless, the record reflects that respondent's trial counsel did not fall to the level of extreme nonaction contemplated in *Cronic*. Instead, the record shows that respondent's counsel filed one motion in *limine* and two other pretrial motions on respondent's behalf, objected to several of the State's motions *in limine*, and took an active role in negotiating jury instructions. Furthermore, counsel undermined Dr. Clounch's and Dr. Suire's testimonies by questioning them on respondent's lack of sexual assault convictions, the age of their reports, and the secondhand nature of their reports. Counsel also pointed out inconsistencies between the experts' testimonies during closing arguments, requested that the jury be polled, filed a motion for a new trial, and actively argued for respondent's conditional release. Clearly, these actions rise above the types of

---

[2] While respondent does suggest that certain motions *in limine* should have been filed in order to exclude or challenge Dr. Clounch's or Dr. Suire's "methods or opinions," he does not specify which "methods or opinions" were improper.

complete nonrepresentation contemplated under *Cronic*, meaning counsel's conduct cannot be presumed to have caused prejudice. Respondent does not otherwise argue prejudice in his brief. Because respondent has consequently failed to establish either the deficient performance or prejudice prongs under *Strickland*, his ineffective assistance of counsel claim necessarily fails.

¶ 43                                    C. Juror Misconduct

¶ 44    Finally, because respondent's arguments of "juror misconduct" are unsupported by any applicable authority, they have been forfeited. A party's appellate brief must be accompanied by citation to pertinent authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, unpublished federal court orders interpreting state law are not precedential and should not be cited for purposes other than dealing with double jeopardy, *res judicata*, collateral estoppel, or law of the case. *Napleton v. Great Lakes Bank, N.A.*, 408 Ill. App. 3d 448, 453 (2011). "Unreported decisions have no precedential value, and this is even more true for decisions from foreign jurisdictions." *American Family Mutual Insurance Co. v. Plunkett*, 2014 IL App (1st) 131631, ¶ 38.

¶ 45    Here, respondent argues that the jury "[c]onducted [j]uror [m]isconduct" solely because their deliberations totaled only 26 minutes. According to respondent, "Such a short period of time, in light of the complex psychological testimony each given by the State's two witnesses, violated the oath as jurors and violated [respondent's] constitutional rights to procedural due process of law." In support of this argument, respondent only cites one case—*United States v. Morgenstern*, 725 Fed. Appx. 546 (2018)—which is unpublished and, being from the Ninth Circuit, nonprecedential. Again, " [u]npublished federal decisions are not binding or precedential in Illinois courts." *Kings Health Spa, Inc. v. Village of Downers Grove*, 2014 IL App (2d) 130825, ¶ 63.

¶ 46    Even if we were to consider *Morgenstern* as persuasive authority, the case does not support

respondent's argument. *Morgenstern* involved a defendant who appealed his convictions for aggravated sexual assault, production of child pornography, and transportation with intent to engage in sexual contact with a child. *Morgenstern*, 725 Fed. Appx. at 547. While the defendant there did similarly argue that the length of the jury's deliberations constituted misconduct, the *Morgenstern* court summarily dismissed the defendant's arguments in three sentences:

> "The jury was presented with an overwhelming amount of digital evidence that depicted [the defendant] performing sexual acts on the victims. No defense was presented at trial. [The defendant] was not denied a fair trial based on the length of the jurors' deliberations." *Id.* at 549.

¶ 47 This brief passage does not suggest that the length of a jury's deliberations alone is demonstrative of juror misconduct. *Id.* The case does not even mention how long the jury there deliberated, further reducing its usefulness as a comparison to the jury's deliberations here. Furthermore, like the evidence produced before the jury in *Morgenstern*, the evidence adduced at respondent's trial was overwhelming. Here, both of the State's experts uncontroverted opinions as to respondent's disorders and likelihood to reoffend were in agreement with one another, and respondent had a pervasive history of sexual misconduct. While respondent's trial counsel correctly pointed out that several of respondent's offenses did not result in convictions for sex offenses, it is clear that those offenses were still sexually motivated and involved sexual misconduct. Respondent's 1991 conviction—which did include a conviction for a sex offense— was particularly disturbing. Respondent also never received treatment that may have lessened his risk of reoffense. Given the staggering weight of this evidence, *Morgenstern* implies that the relatively short length of the jury's deliberations did not deprive respondent of a fair trial. For these

reasons, we decline respondent's request to "rule in his favor on this issue of first impression."

¶ 48                                 III. CONCLUSION

¶ 49    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 50    Affirmed.